IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANADARKO PETROLEUM CORPORATION, | § § | |
| Plaintiff | § | |
| v. | § § | CIVIL ACTION NO. 4:10-CV-3265 |
| DIAMOND OFFSHORE COMPANY, | § § | Admiralty |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Anadarko Petroleum Corporation (Anadarko) files this complaint for declaratory judgment against defendant Diamond Offshore Company (Diamond).

### Preliminary Statement

1. This is an action for declaratory judgment brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure to determine an actual case or controversy between Anadarko and Diamond concerning Anadarko's exercise of force majeure rights under a maritime contract between the parties.

### Parties

2. Anadarko is a Delaware corporation, with its principal office and principal place of business in The Woodlands, Texas.

3. Diamond is a Delaware corporation, with its principal office and principal place of business in Houston, Texas. It may be served with process and a copy of this document by serving its registered agent for service of process, C T Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.

**Jurisdiction and Venue**

4. The drilling contract between Anadarko and Diamond provides that Diamond furnish a drilling vessel, the Ocean Monarch, to Anadarko for the purpose of drilling one or more offshore wells in the Gulf of Mexico. The main piece of equipment to be supplied by Diamond was a vessel, and the contract focused upon the use of a vessel in a maritime transaction. The drilling contract is a maritime contract governed by federal maritime law.

5. This Court has subject matter jurisdiction pursuant to the general maritime laws of the United States and 28 U.S.C. § 1333. This action is within the admiralty jurisdiction of this Court and is an admiralty or maritime claim as that term is defined by Rule 9(h) of the Federal Rules of Civil Procedure.

6. There is an actual and immediate controversy between Anadarko and Diamond. The parties dispute the interpretation of the drilling contract between them and the right of Anadarko to declare force majeure by reason of the moratorium on offshore drilling activity in the Gulf of Mexico. Diamond has written Anadarko that it disagrees with Anadarko's claim that a force majeure event exists as described in the drilling contract and has asserted that it does not accept Anadarko's claim. Diamond asserts that it will continue to invoice Anadarko at the operating rate set forth in the drilling contract.

7. Venue is proper in this district because this is a judicial district in which the defendant is subject to personal jurisdiction and because the contract between the parties was negotiated and executed in this district and Anadarko gave notice of force majeure to Diamond in this district. A substantial part of the events giving rise to, and at issue in, this lawsuit occurred in this district.

**Facts**

8.     Anadarko and Diamond executed a Domestic Daywork Drilling Contract – Offshore (Ocean Monarch) (Contract), providing that Diamond furnish the drilling vessel, the Ocean Monarch, to Anadarko for the purpose of drilling one or more offshore wells in the Operating Area. The Operating Area was defined as the United States Gulf of Mexico (Federal Waters), from a minimum water depth of 300 feet to a maximum water depth of 8,000 feet. The Contract further provided that drilling was to occur on a Designated Well, defined as the well or wells to be drilled in the Operating Area and specified in Appendix A (the Drilling Order). Appendix A specified that the Designated Well was a well or wells to be determined.

9.     The parties anticipated that events of Force Majeure might occur during the term of the Contract, and included the following provisions in Paragraph 1303 to address such potential situations:

> (a)     Except for the duty of Operator or Contractor to make payment hereunder when due, and except as may be provided in this Paragraph 1303, neither party shall be liable for failure to perform the terms of this Contract when such performance is prevented, delayed or rendered impossible by a condition of Force Majeure.  Force Majeure shall mean, Acts of God (other than adverse sea or weather conditions, including but not limited to tropical depressions/storms, hurricanes or loop currents), war, strikes (excluding strikes, lockouts or other industrial disputes or action amongst employees of Contractor and/or its subcontractors), acts of the public enemy, quarantine, epidemic, blockade, civil disturbance, riots, insurrection, rules or regulations of any governmental authority having or claiming jurisdiction or control in the premises, the compliance with which makes continuance of operations impossible, or any other cause beyond the reasonable control of such party, whether or not similar to the causes specified herein.

> (b)     In the event either party hereto is rendered unable, wholly or in part, by any Force Majeure cause to perform its obligations under this Contract, it is agreed that such party shall give notice and details of the Force Majeure circumstances in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations which cannot be carried out by the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obliged to pay to Contractor the Force

Majeure Rate provided for in Paragraph 707. Nothing in this Paragraph 1303 shall be construed to relieve any party of its indemnity and insurance obligations contained in this Contract.

10. The Contract provided for the payment of a Force Majeure Rate for up to a maximum of 30 consecutive days, after which no day rate was payable. The Contract further provided that, after the maximum number of days and during the continuous existence of the Force Majeure condition, either party had the option to terminate the Contract. Specifically, Paragraph 707, <u>Force Majeure Rate</u>, provided:

> The Force Majeure Rate specified in the Drilling Order will be payable during any period in which operations are not being carried on because of a Force Majeure event, as defined in Paragraph 1303 of this Contract, up to a maximum number of consecutive days specified in the Drilling Order, after which no day rate shall be payable. After the maximum number of days specified in the Drilling Order and during the continuous existence of the Force Majeure condition, the Contract may be terminated at the option of either party by giving five days advance written notice to the other party.

11. On or about March 4, 2010, Anadarko assigned its rights, title and interest in and obligations under the Contract to Cobalt International Energy, L.P. (Cobalt) for the limited purpose of enabling Cobalt to use the Ocean Monarch to perform operations on Garden Banks Area Block 959 OCS-G 30876 # 1 (Cobalt's North Platte prospect) and, at Cobalt's option, a second well. The assignment was for a limited period, upon the termination of which Cobalt's rights, title and interest in and obligations under the Drilling Contract would automatically be reassigned to Anadarko or its designee. By letter dated March 10, 2010 to Anadarko and Cobalt, Diamond gave written consent to the assignment.

12. On April 20, 2010, and following the assignment of the Contract to Cobalt, a fire and explosion occurred on the *Deepwater Horizon,* an offshore drilling rig operated by BP, Plc. in the Gulf of Mexico, which led to the sinking of the rig and a deepwater oil spill. In response to these events, on May 27, 2010, the Minerals Management Service (MMS) of the United States

Department of the Interior issued a six month moratorium on deepwater drilling in the Gulf of Mexico, including the suspension of the issuance of permits to drill new deepwater wells for at least six months and a suspension of thirty-three current deepwater drilling projects in the Gulf of Mexico. On the same day, Michael Saucier, MMS Regional Supervisor of Field Operations, specifically suspended Cobalt's permit and all drilling operations on Cobalt's North Platte prospect for six months. Effective May 30, 2010, NTL No. 2010-N04 directed Anadarko, Cobalt and other lessees and operators of federal oil and gas leases to cease drilling all new deepwater wells in the Gulf of Mexico, prohibited Anadarko and Cobalt from spudding new wells, and gave notice that MMS would not consider for six months drilling permits for deepwater wells. NTL No. 2010-N04 further provided that, if the lessee or operator was currently drilling any well covered by the moratorium, it must proceed at the next safe opportunity to secure the well and take all necessary steps to cease operations and temporarily abandon or close the well until further guidance from the Regional Supervisor was received.

13. Cobalt complied with the governmental directives. On May 28, 2010, Cobalt and Anadarko issued a written Force Majeure notice to Diamond under Paragraph 1303 of the Contract, giving notice of a Force Majeure event effective May 27, 2010. The Force Majeure notice stated:

> As you are aware, the tragic and unprecedented effects of the Deepwater Horizon blowout which occurred on April 20, 2010 has resulted in the United States government and/or its regulatory agencies with jurisdiction over oil and gas exploration on the Outer Continental Shelf of the Gulf of Mexico imposing certain restrictions, including but not limited to (i) those announced on May 27, 2010 by President Obama to suspend the issuance of permits to drill new deepwater wells for at least six months and suspend thirty-three current deepwater drilling projects in the Gulf of Mexico and (ii) the specific suspension of Cobalt's permit and all drilling operations on its North Platte prospect for six months, which was communicated to Cobalt in a phone conversation with Michael Saucier, MMS Regional Supervisor of Field Operations, on the afternoon of May 27, 2010. The compliance with these restrictions makes continued operations

> under the Drilling Contract impossible. The impossibility of performance under the Drilling Contract includes, but is not limited to, Section 605(a), which states that the Operator (as defined in the Drilling Contract) "will be responsible for designating the Drilling Site and providing proper and sufficient certificates, permits or permission necessary to enter upon and operate on the Drilling Site."
>
> As a result, and in accordance with and pursuant to Section 1301 of the Drilling Contract, Cobalt hereby provides notice of force majeure effective May 27, 2010. Pursuant to section 707 of the Drilling Contract, and the associated Drilling Order, the Force Majeure Rate will be applicable for a maximum of thirty (30) days.

In the letter, Anadarko stated that it joined Cobalt in the notice of force majeure, since the circumstances set forth in (i) of the letter also made continued operations under the Contract by Anadarko impossible.

14. Effective June 8, 2010, the United States Department of Interior Minerals Management Service issued NTL No. 2010-N05, which imposed increased safety measures prior to the resumption of any deepwater drilling activities in the Gulf of Mexico. The NTL No. 2010-N05 imposed substantial inspection, reporting, third party inspection and certification requirements for offshore drilling rigs and barred the drilling of any new well or the resumption of drilling on any well whose operations had been suspended as a result of the moratorium.

15. Effective June 18, 2010, the United States Department of Interior Minerals Management Service issued NTL No. 2010-N06 imposing new information requirements for exploration plans, development and production plans, and development operations coordination documents on the Outer Continental Shelf.

16. On June 22, 2010, the District Court for the Eastern District of Louisiana in *Hornbeck Offshore Services, LLLC v. Salazar,* Case No. 10-1663, issued an order preliminarily enjoining the Department of Interior from enforcing its drilling moratorium. Despite the ruling, a *de facto* moratorium on all offshore drilling in the Gulf of Mexico continued as a result of the

Department of Interior's failure to issue permits for drilling activities in the Gulf. That *de facto* moratorium continues to the present.

17. On July 12, 2010, the Secretary of the Interior issued a new decision memorandum directing the suspension of the drilling of wells using subsea blowout preventers (BOPs) or surface BOPs on a floating facility, and instructing the Bureau of Ocean Energy Management, Regulation and Enforcement (formerly known as the Minerals Management Service of the Department of Interior) to cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility.  These directives and suspensions apply to drilling in the Gulf of Mexico at any water depth and are scheduled to continue through November 30, 2010, unless modified.

18. Following the termination of the assignment agreement with Cobalt, Anadarko received the Ocean Monarch back from Cobalt on or about August 7, 2010. By letter dated August 9, 2010, Anadarko again gave Diamond written notice a Force Majeure event effective August 7, 2010, which prevented Anadarko from performing the terms of the Drilling Contract. The written notice stated:

> In accordance with Article 1303(b) of the Drilling Contract, Anadarko hereby provides Diamond with written notice of a Force Majeure event, effective as of 12:00 hours on Saturday, August 7, 2010, which is preventing Anadarko from performing the terms of the Drilling Contract.  The Force Majeure event consists of the moratorium on offshore drilling activity in the Gulf of Mexico and regulations related to increased safety and informational requirements, including but not limited to (i) the Decision Memorandum dated July 12, 2010, in which the Secretary of the Interior of the United States announced that the drilling of all wells in the Gulf of Mexico with a subsea or surface BOP would be suspended until at least November 30, 2010, (ii) the decision of other state agencies not to issue CZMA consistencies which are required to conduct drilling activities which are required to conduct drilling activities in waters adjacent to those states, (iii) the issuance by the Bureau of Ocean Energy Management Regulation and Enforcement fka Minerals Management Service (the "Bureau") of the Notice to Lessees of No. 2010-N05 with an effective date of June 8, 2010, which contains new safety and inspection requirements which must be completed prior to

> conducting any operations utilizing a drilling rig, and (iv) the issuance by the Bureau of the Notice to Lessees no. 2010-N06 with an effective date of June 18, 2010, which requires additional information to be provided related to Exploration Plans, Development and Production Plans, and Development Operations Coordination Documents.
>
> The compliance with the restrictions referenced above makes it impossible for Anadarko to continue operations under the Drilling Contract. This impossibility of performance includes, but is not limited to, Anadarko's obligations under Article 605 to provide "proper and sufficient certificates, permits, or permission necessary to enter upon and operate on the Drilling Site." Therefore, pursuant to Article 1303(b) of the Drilling Contract, Anadarko hereby provides Diamond notice of Force Majeure, effective August 7, 2010.

The letter further notified Diamond that Anadarko would compensate Diamond at the Force Majeure Rate set forth in the Drilling Order as of August 7, 2010 and reserved all other rights it might have under the Contract.

19. The Force Majeure condition continued for at least 30 consecutive days. In accordance with Paragraph 707 of the Contract, on September 10, 2010, Anadarko gave written notice to Diamond of termination of the Contract to be effective five days from Diamond's receipt of the notice.

20. By letter dated August 31, 2010, Diamond replied to Anadarko's August 9, 2010 notice of force majeure, stating that it "disagrees with Anadarko's claim that a force majeure event exists as described in the Contract." Diamond asserted that:

> The Contract requires that for rules or regulations of a governmental authority, like the ones to constitute force majeure, compliance with those rules must make "continuance of operations impossible." Thus, the definition of a "force majeure" event under 1303(a) is an event which renders operations impossible. We do not believe operations are impossible.
>
> The Ocean Monarch is in compliance with the requirements for moored rigs set forth in the Bureau of Ocean Energy's ("BOE's") Notice to Lessees No. 2010-N05 ("NTL-5"). Diamond has obtained all certifications required and the Ocean Monarch has undergone all testing and inspections required by NTL-5.

>Anadarko's continued operations have not been rendered impossible and the Ocean Monarch complies with NTL-5. As a result, the rules and regulations cited in Anadarko's letter do not constitute force majeure events. Diamond does not agree that Anadarko may rely on the events cited in its 9 August 2010 letter as a basis for its assertion of force majeure and does not accept Anadarko's claim.

Diamond further stated that it would continue invoicing Anadarko at the operating rate set forth in the Contract. Anadarko disagrees with the position stated by Diamond.

## Declaratory Judgment and Relief Sought

21. Anadarko incorporates the allegations above.

22. In accordance with 28 U.S.C. § 2201, an actual controversy exists between Anadarko, on the one hand, and Diamond, on the other hand.

23. This declaratory judgment action is proper because the judgment will clarify and settle legal relations between Anadarko and Diamond and provide relief from the uncertainty and controversy giving rise to the proceeding.

24. Anadarko seeks, and is entitled to, a judgment declaring that:

   a. A condition of Force Majeure has occurred within the meaning of the Contract;

   b. The Force Majeure condition continued for 30 consecutive days;

   c. Anadarko has given the proper notices required by the Contract; and

   d. The Contract is lawfully terminated as of September 15, 2010, five days after Diamond's receipt of the notice of termination.

25. Anadarko also seeks, and is entitled to, its attorneys' fees, expenses, and costs of court in connection with obtaining this declaratory relief, and such other and further relief to which Anadarko may show itself justly entitled.

Dated: September 10, 2010

        Respectfully submitted,

        /s/ Alison L. Smith
        Alison L. Smith
        Attorney-in-Charge
        Texas Bar No. 18529500
        SDTX ID No. 816
        HAYNES AND BOONE, LLP
        1221 McKinney Street, Suite 2100
        Houston, TX 77010
        Tel:  (713) 547-2673
        Fax: (713) 236-5698
        Email: alison.smith@haynesboone.com

*Attorneys for Anadarko Petroleum Corporation*